UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X   Docket#
UNITED STATES OF AMERICA,      :   12-cr-00134-ERK-MDG
                               :
    - versus -                 :   U.S. Courthouse
                               :   Brooklyn, New York
ADNAN IBRAHIM HARUN A HAUSA,   :
also known as "Spin Ghul",     :
also known as "Esbin Gol",     :
also known as "Isbungoul",     :
also known as "Abu Tamim",     :
also known as "Joseph Johnson",:   August 2, 2013
also known as                  :
"Mortala Mohamed Adam",        :
                  Defendant    :
------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR CONFERENCE
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S:

**For the Government:**          **Loretta E. Lynch, Esq.**
                                 United States Attorney

                       BY:   **Shreve Ariail, Esq.**
                             **Amanda Hector, Esq.**
                             Assistant U.S. Attorney
                             271 Cadman Plaza East
                             Brooklyn, New York  11201


**For the Defendant:**           **Susan G. Kellman, Esq.**
                                 25 Eighth Avenue
                                 Brooklyn, NY 11217



**Transcription Service:**       **Transcriptions Plus II, Inc.**
                                 740 Sharon Road
                                 Copiague, New York 11726
                                 Transcriptions2@verizon.net

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  United States v. Adnan Hausa.

2          Your appearances, counsel.

3          MR. ARIAIL:  Good afternoon, your Honor.

4          Shreve Ariail and Amanda Hector for the United

5  States.

6          MS. HECTOR:  Good afternoon.

7          MS. KELLMAN:  Good afternoon, your Honor.

8          Susan Kellman for Mr. Hausa.

9          THE CLERK:  The interpreter is still under

10 oath.  Please state your name for the record.

11          THE INTERPRETER:  Mohammed Albakaye.

12 (INTERPRETER PREVIOUSLY SWORN)

13          THE COURT:  Okay.

14          MR. ARIAIL:  Your Honor, since the last status

15 conference we submitted to the Court, actually first

16 thing this morning, an evaluation report that was

17 prepared at the Court's direction with respect to the

18 competency of the defendant in this case.

19          As your Honor is aware, there were issues

20 raised about the defendant's mental competency previously

21 and I think at this point, given the doctor's findings,

22 we are -- at least the government is prepared to move

23 forward with the understanding that he is competent.  I

24 think defense counsel agrees with that position at this

25 point.

3

Proceedings

1          MS. KELLMAN:  Well, it's not -- I didn't --
2   it's what the doctor has said.
3          MR. ARIAIL:  Right.
4          THE COURT:  Well, one of the -- I may be
5   reading this too carefully but or too technically is a
6   better word but the doctor says he's not incompetent.
7   But incompetent is a conclusion.  The test for
8   competence, which I would like him to state is whether
9   he's capable of understanding the nature of the
10  proceedings and participate in his defense.  I just want
11  to be sure that we're dealing with the same definition of
12  competence.
13         THE DEFENDANT:  May I speak?
14         THE COURT:  In a minute.
15         MR. ARIAIL:  Certainly, your Honor.  So, as I
16  understand the Court's request, you would like the doctor
17  to opine on that specific framework.
18         THE COURT:  Right, I want to know that I am
19  working -- he and I are both working with the same
20  definition of what constitutes competent.
21         MR. ARIAIL:  Understood, your Honor.  We can go
22  back to him this afternoon and (indiscernible).
23         THE COURT:  I mean I gather from what he is
24  saying is that we are but he doesn't say it in haec verba
25  and I would like to make sure that we're not -- we're

4

Proceedings

1   both -- we both are operating or everybody is operating

2   under the same definition.

3         MR. ARIAIL:  Understood, your Honor.

4         THE COURT:  What else do we have to do today?

5         MR. ARIAIL:  Assuming, your Honor, that's the

6   case and I think that it is the case, prior to today the

7   defendant has made at least a couple of indications to

8   the Court about his desire to possibly represent himself

9   or to seek new counsel and I think to the extent that he

10  is actually asking to represent himself, I think there

11  may be additional inquiry that may be necessary in terms

12  of the psychiatric evaluation.

13        THE COURT:  What are we here for today, aside

14  from -- we went through this the last time.  What are we

15  here for today?

16        MR. ARIAIL:  Your Honor, in terms of the

17  competency, that was obviously the main issue for today.

18  The other issue, I guess at this point is just to inform

19  the Court that in terms of the unclassified discovery in

20  this case, the government is ninety-nine percent complete

21  with the discovery on that front.  I think that the big

22  piece that remains obviously as we indicated to the Court

23  previously is the classified aspects of this case.

24        We had made an application to the Court for an

25  ex parte conference to discuss the schedule -- I'm sorry,

5

Proceedings

1  in camera conference to discuss a schedule in terms of
2  the briefing and we need --
3          THE COURT:  Why does the discussion have to be
4  in camera?
5          MR. ARIAIL:  It doesn't necessarily have to be
6  in camera, your Honor, but it I think would allow for us
7  to talk more freely about what kind of issues we perceive
8  being out there and to educate everybody a little bit
9  more about what we think would happen without any
10  concerns about accidentally disclosing any classified
11  information.  I can give you an overview, too, Judge, in
12  terms of what I think will go on if that's helpful to
13  your Honor.
14          THE COURT:  How do you define in camera?  With
15  the defendant being present or not?
16          MR. ARIAIL:  The idea would be that the
17  defendant is not present, your Honor.
18          THE COURT:  I don't --
19          THE DEFENDANT:  May I speak now or --
20          MR. ARIAIL:  And the Section 2 of the
21  Classified Information Procedures Act provides for an in
22  camera status conference on those sorts of issues,
23  your Honor.
24          MS. KELLMAN:  Well, I am a little confused
25  because we went from ex parte to in camera --

6

                         Proceedings

1              MR. ARIAL:  I apologize about the ex parte.  I

2    meant in camera.

3              MS. KELLMAN:  So we're not talking about

4    excluding counsel.  You're just talking about excluding

5    the defendant.

6              MR. ARIAL:  That's correct.

7              THE COURT:  What's the statutory cite?

8              MR. ARIAL:  It's 18 USC App. 2, I believe or

9    App. 3, Section 2.  It's cited in the letter that I

10   provided to the Court a few minutes ago.

11             THE COURT:  I don't read that quickly.

12             (Pause)

13             THE COURT:  I'm sorry, 18 USC what section?  3?

14   It couldn't be 3.

15             MR. ARIAL:  Sorry, it's 18 USCA App. 3 and

16   then it's Section -- it's the appendix, so it's Section 2

17   of the appendix, your Honor.  I'm not sure that it's

18   actually in the code book.

19             THE COURT:  I have it.

20             THE DEFENDANT:  I need a pen and paper, if I

21   can.

22             THE COURT:  Here, give him a pad.  Oh, you have

23   it?

24             MS. KELLMAN:  I have it.

25             MR. ARIAL:  Your Honor?

7

Proceedings

1          THE COURT:  Just let me finish.

2          (Pause)

3          THE COURT:  Okay.  I assume the defendant is

4    not aware of what's in this classified information?

5          MR. ARIAIL:  That is correct, your Honor.

6          (Pause)

7          THE COURT:  I'm reading this quickly.  I see

8    where the defendant could be excluded from the pretrial

9    conference.  Section 3 says I can issue an order to

10   protect against the disclosure of any classified

11   information disclosed by the United States or any

12   defendant.

13         (Pause)

14         THE COURT:  I just -- you know, I don't want to

15   -- I don't have time to get into a long discussion of

16   this but what do you propose to do -- assuming the case

17   went to trial, what do you propose to do with this so-

18   called classified information.

19         MR. ARIAIL:  Certainly, your Honor.  So,

20   there's a number of different things that I think would

21   come up, just in my experience until dealing with other

22   similarly situated cases.  The first thing that would

23   come up is that the government would move pursuant to

24   Section 4 of the Classified Information Procedures Act

25   for an order from the Court authorizing the government to

8

Proceedings

1  delete or potentially substitute certain discovery that

2  is classified.  And --

3              THE COURT:  I understand that but what do you

4  do at a trial?  I mean, what are you offering at trial?

5  Are you suggesting that you could offer evidence at

6  trial?  I'm just trying to understand.

7              MR. ARIAIL:  So, in terms of -- certainly, your

8  Honor.  In terms of the types of stuff that we would turn

9  over, that includes things that may be Rule 16,

10  potentially Brady material for the defense.  These are

11  things that the defense itself might actually seek to use

12  at trial.

13              There is another process once we make that

14  Section 4 motion and the Court rules on what is the

15  actual disclosure to defense counsel.  Defense counsel

16  has the opportunity to seek to use any of that material

17  through a motion or a notice and then followed by

18  ultimately, potentially a hearing under Section 5 and

19  then defense counsel would then identify particular items

20  that she would seek to use affirmatively in the

21  defendant's defense at trial.  And at that point, the

22  government might object to those applications and prior

23  to trial, the government requests a Section 6 hearing,

24  which is a preliminary proceeding in which the Court is

25  required to make rulings on relevance and admissibility

9

Proceedings

1    and also consider proposed substitutions of that

2    classified information on behalf of -- at the

3    government's request.

4            And similarly in this case, I think it's likely

5    that the government would probably seek to use certain

6    materials as well that might have impact on classified

7    equities pursuant to Section 6.  And in that context, we

8    would also seek that the government -- I'm sorry, that

9    the Court rule in advance of trial pursuant to Section 6

10   that certain items are relevant and admissible, so that

11   we can clear up a lot of the issues that could

12   potentially come up at trial.

13           THE COURT:  What I am trying to follow is if

14   it's relevant and admissible and it's classified, it gets

15   admitted.  I don't understand how this gets done without

16   the defendant having heard this.

17           MR. ARIAIL:  So there's -- the Court is -- just

18   because it's admissible doesn't mean it necessarily is

19   admitted.  If it's classified, the government can seek to

20   substitute the information.  Say for instance, if there's

21   a report related to -- and this has nothing to do with

22   this case -- a report related to an interview of the

23   defendant that is conducted by someone who is very

24   sensitive to the national security of the United States,

25   we may seek to delete use of the name of that person.  We

10

Proceedings

1    may seek to substitute whatever initial report was

2    produced in a case -- sorry, produced in the case with

3    some sort of other type of sanitized document that

4    ultimately could be used at trial or we might seek to

5    stipulate pursuant to Section 6 to certain facts that

6    that person would testify to.  So, those are the sorts of

7    things that we would seek to do.

8            And then to the extent that the Court ordered

9    us to disclose or ordered us to allow defense counsel to

10   proceed with the evidence, there's also the possibility

11   of obviously interlocutory appeals on those issues as

12   well.

13           My point though generally, your Honor, and I

14   understand that it's very difficult for me to articulate

15   it in open court to your Honor but is that there is

16   substantial briefing that's completely unrelated to the

17   normal motions that defense counsel would make in this

18   case and for example, just in terms of my practice -- in

19   prior practice in Section 4 filings that I've done

20   previously have been upwards of 100 to 150 pages.

21   They're just very complicated proceeding -- or briefing,

22   briefs and they're just very difficult issues.

23           And I'm trying to get us to a position where we

24   can come up with a calendar that would accommodate each

25   of these things in turn and that's what I was hoping to

Proceedings

1   do in the conference with your Honor.

2          THE COURT:  Why don't you see if you could

3   agree on a schedule first before I -- you know, maybe we

4   don't even need a conference.

5          MR. ARIAIL:  I can do that, your Honor.

6          THE COURT:  Well, why don't you do that first?

7          MR. ARIAIL:  Okay.  If we could have

8   approximately two weeks to do that, that would be

9   helpful.

10         THE COURT:  Yes.

11         THE CLERK:  How long, counsel?

12         MR. ARIAIL:  If we could do it in three weeks,

13  I think it would probably be best but --

14         THE COURT:  August 23rd?

15         MS. KELLMAN:  I'm actually in L.A. that week.

16  I'll be in L.A.

17         THE COURT:  Why do we need three weeks just to

18  see if you could sit down and agree on a schedule?

19         MR. ARIAIL:  The -- in terms of the equities,

20  your Honor, the government would need to travel at least

21  to Washington to meet with a number of people and

22  understand what the concerns are on their end before we

23  can sit down with defense counsel and come up with a

24  calendar that would work.  That's the real issue is just

25  travel, coordination.

12

Proceedings

1          MS. KELLMAN:  Perhaps, your Honor, we can
2   notify the --
3          MR. ARIAIL:  I think that would --
4          MS. KELLMAN:  -- just with what our plan would
5   be.
6          THE COURT:  So say that again.  You're going to
7   notify me what?
8          MS. KELLMAN:  As to what we think would be a
9   reasonable way to proceed in terms of timing and the
10   Article -- Section 4, 5 and 6.
11          THE COURT:  Okay.
12          MS. KELLMAN:  I can get you a letter by the
13   23rd.
14          THE COURT:  Well, you might as well come in --
15   get me a letter, I'll
16          MS. KELLMAN:  (Indiscernible).
17          THE COURT:  Well, when are you coming back or
18   when are you leaving?
19          MS. KELLMAN:  I'll be out a good part of that
20   week, Judge.  I'll be back on the 26th.
21          MR. ARIAIL:  And I'm out of the office that
22   day, your Honor.  That's the Labor Day --
23          MS. KELLMAN:  No, Labor Day's the following
24   week.
25          MR. ARIAIL:  Oh, yes, sorry.

Proceedings

1          THE COURT:  Let him come back on the 26th.  You

2    could send me a letter on the 23rd anyway, so at least we

3    have some framework.

4          MR. ARIAIL:  If your Honor, if it's -- well, if

5    we could do it on the Tuesday, the 3rd, that's the day

6    that I would return.

7          THE COURT:  I don't understand what --

8          THE DEFENDANT:  Why am I here?

9          THE COURT:  I'll talk to you in a minute.

10         MR. ARIAIL:  I'm off on vacation that week,

11   your Honor, but my counsel -- co-counsel can cover.

12         THE COURT:  So what week are you on vacation?

13         MR. ARIAIL:  The 26th through the --

14         THE COURT:  Can you participate, Ms. Kellman,

15   by phone on the original date?

16         MS. KELLMAN:  Oh, yes, your Honor.

17         THE COURT:  So, let's do it.  You'll

18   participate by phone.

19         (Pause)

20         THE DEFENDANT:  Before I start talking I need a

21   cup for spitting because I am fasting.  First of all, my

22   message that I left last time to be sent to Ban ki-Moon,

23   what was done with that?  I left a letter that's supposed

24   to -- I left a letter that's supposed to be sent to Ban

25   ki-Moon about international court.  What was done with

Proceedings

1   that?  I left it here.  I didn't leave with it.

2          MS. KELLMAN:  Your Honor, he left a

3   (indiscernible) translated that was about twelve pages.

4          THE COURT:  Why don't you just send it?  He

5   wants to send it to the Secretary General of the U.N.

6   Just mail it.

7          THE DEFENDANT:  I didn't say translated.  It's

8   in the --

9          THE COURT:  What do you want me to do with it?

10  Do you want me to send it to him?  Your lawyer has the

11  letter.  She could mail --

12         THE DEFENDANT:  Yes.

13         THE COURT:  I told her to mail it to Ban ki-

14  Moon.

15         THE DEFENDANT:  That's the first.  If it's

16  possible, the same way you gave me the attorney, in the

17  same way you can take the lawyer away. Please take her --

18  take my lawyer away.

19         THE COURT:  Why?

20         THE DEFENDANT:  I said I would represent

21  myself.  I don't want somebody else to represent me.  I

22  will stand up for myself because the truth is, there is

23  politics of hidden agenda.  For example, my explanation

24  of my responsibility in the eleven -- in the attacks on

25  September 11th, I gave those explanation -- I gave that

15

Proceedings

1  explanation in Agrigento but here when I were -- they

2  were collecting the report, Shreve told me that I

3  shouldn't say it right now, I should leave it for later

4  and Rashad el Mohammed (ph.), the FBI agent, she will

5  write -- she said she will write it as a side issue, not

6  in the main report.

7         That's perplexing because that is the most

8  important thing that America has -- that I've done

9  against America -- that America can accuse me of.

10         THE COURT:  Is he accused of that?

11         MR. ARIAIL:  Of participating in the attacks on

12  September 11th?  No, your Honor.

13         THE COURT:  So you're not being accused of

14  that.

15         THE DEFENDANT:  I don't -- I don't -- I don't

16  know if they're charging me with that but --

17         THE COURT:  They're not.

18         THE DEFENDANT:  -- I -- I'm saying that -- I've

19  said it in previous conversations that I took part in it

20  because when I sat -- because when I sat with them, they

21  want me to tell -- they wanted me to tell the truth and

22  not to hide anything.

23         THE COURT:  All right.  Well, they're not

24  charging you.  Whatever you said to them, they're not

25  charging you with it.  So, you don't have to worry about

16

Proceedings

1    it.

2              MR. ARIAIL:  And just to be clear, your Honor,

3    in terms of the allegations, part of the allegations are

4    though that he joined el-Qaeda on or about the time of

5    the September 11th attacks.

6              THE COURT:  So what?

7              MR. ARIAIL:  That's the first step.  The second

8    thing is my Quran.  He said he would bring a Quran like

9    my Quran.  The last time they brought me a Quran that's

10   not like the one I had.  I did not take it.  I said I

11   would take it directly from the government.  If they

12   can't bring me a Quran like that one, they can give me a

13   photocopy of the Quran that's in their possession.

14             THE COURT:  There's a new Quran that they've

15   given you.

16             THE DEFENDANT:  Not this one.  Not this one.

17   If it's -- if it's possible at all for me to have the one

18   I had before or a copy of it, that would help me a lot in

19   reading.

20             THE COURT:  Is it possible?

21             MR. ARIAIL:  I can look into it, your Honor.

22             THE COURT:  Okay.

23             MS. KELLMAN:  I assume by looking into it, you

24   mean -- you're talking about a photocopy of the one.

25             MS. HECTOR:  Yes.

Proceedings

1          THE DEFENDANT:  Also seeing the representative

2   of the Niger government, the embassy, if at all possible,

3   with the Judge's knowledge.

4          THE COURT:  We've gone over this.  I assume

5   that --

6          THE DEFENDANT:  Please connect me with the

7   embassy of Niger.

8          THE COURT:  I thought you were connected with

9   the embassy of Niger.

10          THE DEFENDANT:  They connected me with Mohammed

11   Sadiq (ph.) but I don't trust one hundred percent that

12   he's a representative of the Niger government.

13          THE COURT:  Well, I can't do anything about

14   that.

15          MS. KELLMAN:  For the record, your Honor, his

16   business card represented him to be the ambassador for

17   the country of Niger.

18          THE COURT:  Well, it must be a matter of record

19   published somewhere who the ambassador to Niger is to

20   either the U.N. or the United States.

21          MS. KELLMAN:  His name appears on the country's

22   Web site.

23          THE COURT:  Okay.

24          THE DEFENDANT:  I spoke with him.  I told him I

25   wanted to speak with the government of Niger and Yemen.

Proceedings

1   It's what they found me -- what they were -- what

2   happened to me in Libya and Italy are different --

3   matters from what transpired here and I want to discuss

4   those matters with the Niger government.

5           THE COURT:  I don't stop you.

6           THE DEFENDANT:  I just want you to facilitate

7   the meeting between me and the --

8           THE COURT:  You didn't want -- as what I

9   understand is you didn't want to meet with this guy

10  because you don't believe he's the ambassador.  So,

11  anybody who shows up, you'll say I don't believe you're

12  the ambassador.  He's listed on the Web site.  He gave

13  you his card.  He's listed on the Web site as being the

14  ambassador.  I don't know what I can do.

15          MS. KELLMAN:  And they did meet, your Honor,

16  for a substantial period of time.

17          THE DEFENDANT:  If he brings his identity card,

18  I would have to agree with him.  I would have to agree

19  that he was a representative.  For example, I would --

20  you know, I would come and meet with you.  I didn't bring

21  you any identification card and bring you a card and -- a

22  business card and say I'm so and so and tell you I'm a

23  representative of Niger; you wouldn't believe that.  My

24  thinking is you wouldn't agree because you would want an

25  I.D. card that says I'm a representative of the Nigerian

19

Proceedings

1  embassy.

2          MS. KELLMAN:  Just to be clear, your Honor, the

3  way that we reached this individual is by e-mailing the

4  embassy and he responded to our e-mail and then we spoke

5  with him at the embassy or what he represented was the

6  embassy and he came here to the eastern district with his

7  credentials which he presented to us in the United States

8  Attorney's Office.

9          THE COURT:  I can't do anything more.  What

10  else?

11          THE DEFENDANT:  You can't do anything about it

12  at all?

13          THE COURT:  Well, you heard.  He -- they

14  contacted the embassy.  They had communications by

15  e-mail.  He came.  He had credentials.  I don't know what

16  you want.  Why would he show up here all together?  I

17  mean, in the way that -- he's listed on the Web site as

18  being the ambassador.

19          THE DEFENDANT:  It's not regarding the case

20  against me.  This is my right because I'm a Nigerian

21  citizen.

22          THE COURT:  It doesn't matter.  I mean, your

23  right has been honored as far as I could tell.

24          THE DEFENDANT:  Well --

25          THE COURT:  You don't believe that the person

Proceedings

1   who came to see you was the Nigerian ambassador.  I mean,

2   I can't deal with this.

3          THE DEFENDANT:  It's important because I've got

4   -- you should know that when I entered Libya, I entered

5   Libya with a Visa and a passport.  They took my passport

6   away; the Lybian police since 2005.  I also met with the

7   CIA in Lybia.  I also met with the French government and

8   the Italian government.

9          THE COURT:  Who cares?  I'm not interested in

10  who you met with.

11         THE DEFENDANT:  The Lybian police were the ones

12  who took me to Lampedusa when the Lybian revolution

13  started; they're the ones who took me -- put me on an

14  airplane and took me to Lampedusa because of an

15  understanding between the Lybian government and the

16  Italian government.

17         THE COURT:  Mr. Hauser, I can't -- this is --

18  some of these things you've told me before.  I have

19  another matter on my calendar and I have to break in

20  about -- a few minutes and handle the other matter.

21         As far as you wanting to represent yourself,

22  it's a piece of foolishness.  There's a saying in the

23  United States that he who is his own lawyer -- listen to

24  me -- he who is his own lawyer has a fool for a client.

25  Now --

21

Proceedings

1        THE DEFENDANT:  Even if -- even if -- even if I

2   am a fool, even if I am crazy, it's still my right.

3        THE COURT:  Yes, it's still your right.

4        THE DEFENDANT:  I'm not an American.  I'm not

5   Italian.

6        THE COURT:  It's still your right.  It's still

7   your right because the Supreme Court in what I think is a

8   foolish decision, has said so.  But I have to go through

9   a whole allocution with you to make sure you understand

10  what you're doing and even then, I would appoint

11  Ms. Kellman as what we call standby counsel which means

12  that if you wanted to talk to her, you could talk to her.

13  And if you didn't want to talk to her and if you didn't

14  want her advice and you didn't want her to do anything,

15  she'll just sit in the courtroom.

16       THE DEFENDANT:  I want to remind you of

17  something.  There's protocol, there's law that applies to

18  the United Nation and all nations.  That's why the

19  international court was created.

20       THE COURT:  Listen, the international court --

21  if the international court in Rome is what you're talking

22  about, it was created to try people who committed

23  violations of customary international law and it doesn't

24  preclude your prosecution in United States.

25       Look, I don't have time for this discussion

22

                         Proceedings

1   right now.  We have this scheduled to come back in three

2   weeks and you could talk to me some more.

3           THE CLERK:  Counsel you'll be advised as to the

4   time.  Thank you.

5           MS. KELLMAN:  Thank you, Judge.

6           THE DEFENDANT:  If this how things are going to

7   progress next time, I don't even want to come.  I am

8   sorry.  This is no court.  This is not.

9           THE COURT:  Well, if you don't want to come,

10  just tell them.  I'm not going to force you to come.

11  Just say you don't want to go.

12                  (Matter concluded)

13                       -o0o-

14

15

16

17

18

19

20

21

22

23

24

25

23

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **21st** day of **August** 2013.

*Linda Ferrara*

Linda Ferrara

CET**D 656
Transcriptions Plus II, Inc.